UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Angela Kristie Hey,                                   Civil No. 14-1704 (DSD/FLN)

              Plaintiff,

       v.                                             **REPORT AND**
                                                      **RECOMMENDATION**

Carolyn W. Colvin,
Acting Commissioner of Social Security,

              Defendant.

_____

Lionel Peabody for Plaintiff.
Pamela Marentette, Assistant United States Attorney, for Defendant.

_____

       Plaintiff Angela Kristie Hey seeks judicial review of the final decision of the Acting

Commissioner of Social Security ("Commissioner") denying her application for disability insurance

benefits and supplemental security income. The matter was referred to the undersigned United States

Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

This Court has jurisdiction over the claim pursuant to 42 U.S.C. § 405(g). The parties have

submitted cross-motions for summary judgment. *See* ECF Nos. 10, 12. For the reasons set forth

below, the Court recommends that the Commissioner's motion be **GRANTED** and Plaintiff's

motion be **DENIED**.

## I. INTRODUCTION

       Hey filed her application for disability insurance benefits on May 17, 2011, initially alleging

an onset date of August 1, 2010. Administrative Record [hereinafter "AR"] 87, 174–75, ECF No.

9. On June 1, 2011, she additionally filed an application for supplemental security income. AR 86,

178–84. Both claims were denied initially and again upon reconsideration. AR 23, 110, 115, 126,

129. An administrative hearing was held on February 26, 2013, before Administrative Law Judge ("ALJ") Paul Gaughen. AR 23. At the hearing, Hey amended her alleged onset date to February 1, 2012. AR 23, 42. The ALJ denied Hey's application for disability insurance benefits and supplemental security income on March 13, 2013. AR 23–32. On April 24, 2014, the Appeals Council denied Hey's request for review, rendering the ALJ's decision final for purposes of judicial review. AR 1–4; *see* 20 C.F.R. § 404.981. Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), Hey commenced this civil action on May 30, 2014, seeking reversal of the ALJ's decision or, alternatively, a remand for further proceedings. Compl., ECF No. 1.

## II.  STATEMENT OF FACTS

### A.  Background

Hey was born on September 17, 1983 and was 27 years-old when she filed her application for disability insurance benefits on May 17, 2011. AR 23, 87, 174–75. She claims disability status since February 1, 2012—her amended alleged onset date. AR 23, 42, 86–7. Hey alleges disability due to cerebellum deterioration, cerebellum atrophy, and double vision. AR 244. At her hearing, Hey additionally alleged dizziness, problems with her hands, migraines, and unsteadiness. AR 47. Hey has a GED and approximately three months college education as a veterinary assistant, but has never worked in that field. AR 57. Her past relevant work experience includes telemarketer, fast food worker, and patient transporter. AR 56–57.

### B.  Medical Evidence

In November 2009, Hey was referred by Dr. Jason Buffington to the Ear, Nose, and Throat ("ENT") unit at SMDC Medical Center Duluth for evaluation of dizziness. AR 373. She reported that she had been experiencing intermittent sensations of being off balance and lightheaded for about

one year, initially with double vision. *Id*. According to Hey, the spells were very brief but were getting more frequent and lasting longer. *Id*. A magnetic resonance image ("MRI") of the orbits and brain was subsequently taken on December 7, 2009, but was considered unremarkable by the interpreting physician, Dr. Daniel Mullins. AR 384.

On March 9, 2011, Hey returned to ENT for reevaluation because her dizziness had become progressively worse over the past year. AR 358. The assessment of Kimberly Lakhan, P.A.-C.,was dizziness and ataxia, which appeared to be of central origin. *Id*. Lakhan noted, "Despite this normal MRI interpretation, I am very concerned about the possibility of central pathology, i.e., cerebellar, as a cause of her symptoms." AR 359. Hey was referred to neurology for further evaluation and encouraged to follow up with physical therapy to work on her balance issues. *Id*.

Per Lakhan's referral, on March 11, 2011, Hey submitted to a vestibular evaluation and computerized dynamic posturography conducted by physical therapist Raquel Mead, P.T. AR 364. Hey's computerized dynamic posturography testing revealed abnormalities of balance and sensory organization. *Id*. While a motor control test summary indicated performance attributes in the normal range, Hey scored below normal for all backwards translations. AR 364–65.

Dr. Mostafa Farache, a neurologist, also examined Hey at Lakhan's request on March 14, 2011. AR 360. As part of the examination, Dr. Farache reviewed Hey's MRI from 2009 and determined that it "showed mild cerebellar atrophy," which he noted was significant for such a young patient. AR 361. Overall, however, Dr. Farache concluded that the findings upon examination were very mild and recommended that Hey return to the clinic in three months for a follow up examination. *Id*.

On April 19, 2011, Dr. Thomas Shuey, an ophthalmologist, examined Hey and noted that

she has a moderate horizontal nystagmus which could possibly be related to her ataxia and cerebellar atrophy. AR 357. Hey's vision measured 20/20 in each eye without correction and no treatment was recommended at that time. AR 356–57.

In June 2011, Susan Gray, R.N., part of the neurology practice, conducted the follow up examination of Hey that was recommended by Dr. Farache. AR 354. Gray noted that Hey's blood tests were all within normal limits *Id*. Upon examination, Gray determined that Hey's memory was intact, her upper and lower extremities were strong with good muscle tone, and her gait was stable. AR 355.

Dr. Isaac Marsolek, a state agency consulting physician, completed a Disability Determination Explanation in connection with Hey's disability claims on August 10, 2011. AR 68. Dr. Marsolek noted that Hey had a severe impairment of the central nervous system. AR 71. He reviewed Hey's medical file and completed a physical residual functional capacity ("RFC") assessment. AR 72–74. He determined that Hey could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk for four hours a day, and sit for six hours a day. AR 72–73. In forming his opinion, Dr. Marsolek considered Hey's subjective complaints and medical reports showing that Hey had a cerebellar atrophy diagnosis and issues with balance and dizziness, yet she had no balance issues when seated, normal gait and strength, and the ability to continue driving and performing activities of daily living. AR 73. Accordingly, Dr. Marsolek concluded that Hey has the RFC to perform past relevant work despite her limitations. AR 75.

In August 2011, Dr. Eric Enberg, Hey's primary care physician, noted Hey's history of mild cerebellum atrophy as well as mild diplopia. AR 407. Later in September of 2011, Dr. Enberg noted episodes of left hip pain radiating down the back of the left leg on and off for several weeks. AR

409. Dr. Enberg also noted that Hey has problems with ambulation but can still conduct all of her activities of daily living. *Id*.

In October 2011, Dr. Shuey conducted a follow up examination of Hey. AR 419. Hey reported having more trouble with double vision at night, particularly when driving. *Id*. Dr. Shuey noted that all of her previous symptoms (balance issues, nystagmus, and double vision) had progressed. *Id*. Hey's vision remained 20/20 in each eye without correction and the iris, lenses, cornea, macula, vessels, and optic nerve appeared normal. AR 420. Dr. Shuey prescribed lenses with prisms to help with nighttime driving. *Id*.

Dr. Gregory Salmi, the state agency consulting physician upon reconsideration, completed a second Disability Determination Explanation in connection with Hey's disability claims on December 1, 2011. AR 93. Dr. Salmi made identical findings to those of Dr. Marsolek, including the conclusion that Hey has the RFC to perform past relevant work despite her limitations. AR 93–97.

In March 2012, Dr. Enberg examined Hey again after she reported a problem with slurred speech. AR 479. During the examination, Dr. Enberg noted that her speech was a little slower, but she did not slur her speech or search for words. AR 480. Her gait was wide and she preferred to hold on to objects to steady herself, but her cranial nerves appeared intact. *Id*. Dr. Enberg ordered a second MRI which was taken on March 28, 2012. AR 481. The interpreting physician, Dr. Fred Ekberg, concluded that the MRI was normal with no evidence to suggest cerebellar atrophy. *Id*.

On April 23, 2012, neurologist Dr. David McKee examined Hey on referral from Dr. Enberg. AR 473. Dr. McKee noted that both the 2009 and 2012 MRIs of Hey's brain were normal. *Id*. Additionally, she had no tremor or ataxia of the extremities and no cognitive decline. *Id*. Dr.

McKee's impression was as follows:

> The patient does not have cerebellar atrophy. Her MRI is normal. Her symptoms consisting of intermittent sudden loss of balance are not consistent with the diagnosis. In fact, her presentation appears to be functional. There is probably a secondary gain motive in that the patient is now applying for Social Security disability. As noted above, the patent consistently veered towards the furniture in the exam room when walking. Though she describes falling and hitting her forehead against the edge of the step just three days ago, there is no hint of a bruise. I think there is an outside chance of a myelopathic disorder. I am going to obtain an MRI of the cervical spinal cord but if it is negative, I don't think there should be further workup.

AR 474.

In May 2012, Hey reported to Dr. Enberg that she still had slurred speech and had fallen several times in the previous week. AR 486. Dr. Enberg noted that Hey was in "a bit of turmoil" and really wanted a diagnosis. *Id*. Dr. Enberg's assessment remained cerebellar atrophy, and he referred Hey to the Mayo Clinic Department of Neurology. AR 487. In August 2012, Hey additionally complained to Dr. Enberg of painful headaches occurring one to three times per week. AR 495. Dr. Enberg prescribed migraine medication. *Id*.

In December 2012, Mayo Clinic neurologist Dr. Bruce Krueger and physical medicine and rehabilitation specialist Dr. Mehrsheed Sinaki diagnosed Hey with autosomal-dominant cerebellar degeneration. AR 500. Dr. Krueger concluded that Hey's recent brain MRI from March 28, 2012, "clearly shows midline cerebellar atrophy." AR 503. Dr. Krueger's interpretation was corroborated by radiologist Dr. C.H. Rydberg who similarly concluded that the MRI showed "moderate generalized cerebellar atrophy." AR 506. Dr. Krueger's neurological examination revealed that Hey had mild ataxic dysarthria, she could not walk tandem, and she had ataxia of heel-to-shin movements. AR 503. Dr. Krueger believed that Hey would benefit from Physical Medicine and Rehabilitation review. AR 504. Dr. Sinaki's physical examination showed that Hey had a normal

range of motion in her spine, joint range of motion was pain-free, her cranial nerves were intact, and she had normal and symmetrical muscle strength. AR 502. However, she observed that Hey had reduced coordination in both upper and lower extremities. *Id*. Dr. Sinaki concluded that Hey needed gait aids (e.g., a walking stick or cane) to walk independently and safely during physical therapy. *Id*.

On December 19, 2012, Dr. Enberg saw Hey for a follow-up appointment after her visit to the Mayo Clinic. AR 497. Dr. Enberg's assessment of Hey's condition was familiar cerebellar ataxia and migraine headaches without aura. *Id*. Hey's treatment consisted of an in depth discussion of cerebellar ataxia and prescription medication for the migraine headaches. *Id*. On January 18, 2013, Dr. Enberg assessed Hey's physical limitations. AR 499. He restricted Hey to less than two hours of standing or walking, very little lifting and carrying, and stated that she was unable to sustain work activity eight hours a day, five days a week due to her significant, persistent, and progressive disorganization of motor function in all extremities. *Id*.

Hey began physical therapy at St. Luke's Physical Rehabilitation services on January 7, 2013. AR 513. Hey's physical therapist noted that her functional limitations included difficulty with grooming, bathing, and dressing herself; difficulty performing homemaking or meal preparation; difficulty walking on even and uneven surfaces; difficulty getting up from chairs or bed or in/out of a car; and difficulty with turning or reaching. *Id*. Hey was initially assigned a Lower Extremity Functional Scale score of 26/80 and a Berg Balance Scale score of 39/56. *Id*. Hey began using a two-wheeled walker as part of her physical therapy on January 10, 2013. AR 515. Therapy sessions included such exercises as using the walker to navigate obstacles and picking up objects from the floor. AR 517. The physical therapist reported to Dr. Sinaki that Hey was using a two-wheeled

walker for generalized mobility and safety and had made progress, including increased tolerance to functional activities. AR 519. Hey was discharged on February 18, 2013 due to the fact she had met her therapy goals and reached a plateau of progress. AR 528. At discharge, the physical therapist noted that Hey had tolerated therapy sessions well, was currently using a two-wheel walker to reduce risk of falls, and had improved her Berg Balance Scale score to 46/56. *Id.*

In January and February 2013, two of Hey's friends and her mother submitted third party statements in support of her application of disability benefits. AR 314–18, 325–29. Verlene Waugh, who has known Hey since she was 15 years old, stated that she remembers Hey having balance problems beginning around age 18. AR 314. Waugh described several instances in which she witnessed Hey fall over the years, as well as her trouble with migraines and slurred speech. AR 316. Hey's mother, Laurie Hey, said that she had seen Hey's ongoing problems with headaches, dizzy spells, blurred and double vision, and balance related problems. AR 317. According to Ms. Hey, these issues have created problems for Hey at work and at home, particularly in caring for her young son Hunter. *Id.* Similarly, Hey's friend Lynette Morinville wrote that she had noticed Hey's clumsiness and propensity to fall since their first meeting. AR 325. Morinville believes that Hey's condition has gotten worse over the years, such that she must now hold on to objects to help move around and does not carry her son because she fears falling with him. AR 325–27. Morinville described Hey as an honest person with a strong work ethic who hates the fact that she is unable to work due to her medical problems. AR 328.

On April 4, 2013, Dr. Neil Johnson conducted a post-hearing consultative examination of Hey. AR 529. Upon examination, Dr. Johnson noted that Hey's speech was clear and, although she used a two-wheeled walker, she could walk across the examination room without it. AR 531. He did

note, however, that her gait was mildly wide-based and she could not tandem walk without holding on to something. *Id*. Dr. Johnson did not record any abnormality of the eyes beyond a visual acuity of 20/40 in the right eye and 20/30 in the left eye without glasses. *Id*. Hey showed full range of motion of the joints and hands and had only mild difficulty getting on an off the exam table. *Id*. She displayed a "hint of minimal wavering," her wrist movement's were a little slow, and she struggled mildly with heel-to-shin movements, however, Dr. Johnson detected no localized weakness. AR 532.

Dr. Johnson concluded that Hey displayed a history of ataxia but noted the discrepancy between the Mayo Clinic physicians and Dr. McKee regarding Hey's cerebellar atrophy diagnosis. AR 532. Additionally, Dr. Johnson stated that he did not have Hey's Mayo Clinic records to clarify the results of her MRIs and concluded that further clarification and neurological follow up were necessary. *Id*. Notwithstanding this discrepancy, Dr. Johnson determined that Hey had a capacity to perform a limited range of sedentary work. *See* AR 534–39. His assessment indicated that Hey could lift twenty pounds occasionally and ten pounds frequently; she could carry up to ten pounds occasionally; she could sit two hours at a time, stand fifteen minutes at a time, and walk ten minutes at a time. AR 535. In an eight hour work-day, she could sit for a total of eight hours, stand for two hours, and walk for one hour. *Id*. Dr. Johnson concluded that Hey did not require the use of a cane, she could perform postural activities (except ladders or scaffolds) occasionally when "holding on," and she could view a computer screen and read ordinary print. AR 535–37.

## C.    The Administrative Hearing

The administrative hearing in this matter was held on February 26, 2013. AR 23. Hey was represented by counsel and testified on her own behalf. *Id*. A vocational expert also testified at the hearing. *Id*.

### 1. Hey's Testimony

When requested by her counsel to describe generally the problems affecting her ability to work, Hey testified, "I am constantly falling over. I get dizziness. I have problems with my hands. I, I get migraines. I, I sway back and forth, knowing it or not knowing it. I've been told that I, I do it when I'm just standing." AR 47.

Regarding her migraines, Hey testified that they are brought on by certain lights or sounds and occur approximately one to three times per week. AR 47. Hey describes the pain associated with these migraines as an eight on a scale of ten, until she can get them under control with her prescription mediation. *Id*. According to Hey, her migraines, when severe, are incapacitating to the point where she "really can't do anything" and must sit down in a dark, quiet room. AR 48. Hey stated that the worst of these headaches can last for about two hours while minor ones last for a half-hour to forty-five minutes. *Id*. Hey testified that she has been experiencing these severe migraines since August 2012. AR 50.

With respect to her balance, Hey testified that she has experienced this problem since she was about 18 or 20 years old. AR 48. When she was young, she thought her balance issues were due to clumsiness. AR 49. But now, she contends that her situation has progressively gotten worse such that she cannot reach for anything or even walk without losing her balance. *Id*. According to Hey, she began using a walker in January of 2013 because she was "completely unsteady." *Id*.

When questioned about her dizziness, Hey stated that it affects her whole body such that she must hold on to something to keep from losing her balance. AR 50. She said that these dizzy spells typically occur when she stands up quickly or when she bends down to grab her son. *Id*. Hey also stated that she gets double vision, particularly when looking to either side or when driving a car. AR

52.

Hey additionally testified that she has noticed problems with her hands since the birth of her son. AR 50. She described a lack of control over her hands, poor hand-eye coordination, and poor fine finger skills. AR 50–51 She asserts that it takes her three times longer to perform tasks than it used to. *Id*. In her opinion, she would be unable to perform a job that required use of the hands to move either large items (e.g., boxes) or small items (e.g., nuts and bolts). AR 51–52.

In addressing her speech related problems, Hey stated that these issues come and go. AR 53. When these problems do occur, however, she said that she has to speak extremely slow in order to communicate. *Id*. She stated that her troubles with slurred speech have occurred twice, for two months at a time in each instance. *Id*.

Finally, Hey also provided testimony regarding her daily activities. She stated that her problems present issues for her in trying to keep up with her son. AR 53. Although she can prepare meals, she uses the microwave or oven to eliminate cooking. AR 54. When her boyfriend is home from working overnights, he helps with the cooking and laundry. *Id*. She did state, however, that she can perform some housework such as vacuuming, but does not clean the bathroom because she often falls in there. *Id*. Hey testified that she spends most of her time sitting on the floor with her son, but he is now beginning to walk which she believes will pose a problem because of her limitations. AR 55. She also stated that she is unable to take her son with her when she leaves the house because she cannot carry her son to and from the car. AR 55.

### 2. Vocational Expert's Testimony

After Hey testified, the ALJ posed the following hypothetical to James Parker, the vocational expert ("VE"):

Hypothetical one, Mr. Parker, it is essentially a restatement of what I indicated earlier in the hearing colloquy with counsel. It involved these background facts, a lady with the work history you explained to us, is a younger individual 26, or rather about 28 at the beginning of the relevant period, and now 29 or 30 years old, and she is a high school graduate. The individual does not present with mental health related impairments.

Due to neurological condition, she presents in hypothetical A the capacity for light exertion as defined in the Dictionary of Occupational Titles, but with exceptions and limitations. She cannot work in, in a place that has extremes of temperature going either way, hot or cold, and also includes excessive humidity.

A dangerous industrial setting or work at unprotected heights or driving as part of a job or occupation, once she gets to work, would also not be performable on a regular basis, but please assume the individual could get to a jobsite.

She can't do fast-paced production work, but assume that she could attend to the basic work activities in and around these parameters. In a typical workday, she could be on the feet standing or walking to no more than about four hours out of eight, and not all at once. Assume about one or one-and-a-half at once. Sitting is essentially not restricted if the individual had no unusual work stressors and the benefit of some lunch period to split the shift.

Also to amplify, if she worked on the feet standing or walking for no more than about four of eight, assume that the balance of a workday could be done in a seated position or as discussed at the option of an employer, she could attend to sedentary activities during the whole shift seated.

Postural adjustments and lifting, those could be done less than occasional, but assume at least ten or fifteen percent with respect to time measurement, lifting and carrying objects since she's off—yeah, assume it would be less than twenty perhaps fifteen pounds, give or take on an occasional basis, and she's not going to be frequently carrying objects while on the feet, even if they're of negligible weight.

Any kind of fine balancing tasks, such as carrying objects which should not be dropped, these could not be performed while she is walking. The individual will be awkward and, and, and not swift in doing work-like activities requiring her to walk. Conversely assume she can attend to sedentary type activities if she's in a chair without having significant dysfunction.

AR 57–59.

The VE testified that such an individual could not perform the claimant's past relevant work

of telemarketer, fast food worker, and patient transporter. AR 59. The VE stated that sedentary work, by definition, does require some standing and walking and the use of a walker prevents bimanual activity. *Id*. According to the VE, any time walking would be required, the individual would be off task. AR 59. In addition, the individual's limitation of less than occasional postural activities would also prevent essential activities of sedentary work. AR 60. Based on the hypothetical individual's need of a walker and postural limitations, the VE concluded that the individual would be unable to sustain both light and sedentary work. AR 60.

The ALJ then modified the hypothetical, asking the VE to assume that the worker was in a sedentary job *only* in which the individual would have the ability to sustain a seated position. AR 61. The VE responded that the hypothetical individual could perform Hey's past relevant work as a telemarketer. *Id*. The VE reported that there were approximately 800 telemarketer postions in Minnesota. *Id*. In addition, the VE testified that additional occupations, such as inspection table worker and jewelry preparer polisher, would be appropriate. AR 62. The VE reported that there were approximately 450 inspection table worker positions and 300 jewelry preparer polisher positions in Minnesota. *Id*.

On cross-examination by Hey's counsel, the VE stated that most sedentary work requires some time on your feet, even when seated for most of the day. *Id*. In addition, the VE indicated that a worker using a walker and moving awkwardly or slowly could result in that worker potentially being off task. AR 63. The VE also testified that telemarketer work requires speaking to customers and using a computer, which would be problematic for a worker who has weekly recurring headaches, issues with fine finger dexterity and hand speed, and impaired speech. AR 63–64.

### 3.     The ALJ's Decision

On May 13, 2013, the ALJ issued a decision denying Hey benefits. In determining that Hey was not disabled, the ALJ followed the five-step sequential process established by the Social Security Administration as outlined in 20 C.F.R. §§ 404.1520(a) and 416.920(a).

The first step in the sequential evaluation is to consider the claimant's work history to determine whether she has engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant has performed substantial gainful activity, she is not disabled. *Id.* At step one, the ALJ found that Hey had not engaged in any substantial gainful activity since February 1, 2012, the amended alleged onset date. AR 25.

The second step in the sequential evaluation is to determine whether the claimant has a severe impairment that significantly limits her physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c). At step two, the ALJ found that Hey had one severe impairment: autosomal-dominant familial cerebellar ataxia. AR 25.

The third step in the sequential evaluation requires the ALJ to determine whether the claimant has an impairment that meets or equals one of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d) and 416.920(d). At step three, the ALJ determined that Hey did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1. AR 27.

If the claimant's impairment does not meet or equal one of the listings in Appendix 1, then the ALJ must make an assessment of the claimant's RFC. 20 C.F.R. §§ 404.1520(e) and 416.920(e). Here, the ALJ concluded that Hey had an RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) with the following restrictions:

> [S]he requires a sit/stand option in which she can stand and walk short distances up to 1–1.5 hours at a time and 4 hours total in an 8-hour workday, with no limitations

14

in sitting. If she works on the feet 4 hours total, she can spend the balance of the day in a seated position or otherwise work the entire shift seated. She is limited to occasional postural adjustments, but cannot climb ladders, ropes, or scaffolds. She can occasionally lift and carry about 15 pounds, but is unable to lift or carry frequently even negligible amounts of weight. She cannot tolerate temperature extremes, excessive humidity, work at unprotected heights, dangerous work settings, unusual work stressors, fast pace production work, or driving as part of an occupation, but can get to the job site. She does not require an assistive device to ambulate.

AR 27. In making this determination, the ALJ found that Hey's statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely credible, particularly with respect to her testimony of needing a walker to ambulate. AR 28–29. In addition, the ALJ attributed significant weight to the opinion of consultative examiner Dr. Johnson and persuasive weight to the opinions of the state-agency physicians who reviewed this matter. AR 30. The ALJ, however, granted only limited weight to the opinions of Dr. Enberg, Hey's primary care physician, and Dr. Sinaki, the Mayo Clinic physical medicine specialist who determined Hey needed a gait aid, finding that the record as a whole was not supportive of the degree of limitations these doctors described. AR 29.

In the fourth and fifth steps of the sequential evaluation process, the ALJ must determine whether the claimant has the RFC to perform either her past relevant work or any other jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1520(g), 416.920(f), and 416.920(g). If the ALJ determines that the claimant can still perform her past relevant work the ALJ will find that the claimant is not disabled. §§ 404.1520(f), 416.920(f). If the claimant cannot perform her past relevant work, then the "burden shifts to the Commissioner to prove, first, that the claimant retains the [RFC] to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy." *Cunningham v. Apfel*, 222

F.3d 496, 501 (8th Cir. 2000).

At step four, the ALJ found that Hey was able to perform her past relevant work as a telemarketer. AR 30. This determinaiton was based on the VE's opinion that an individual with Hey's age, education, work experience, and RFC would be able to perform the requirements of the position. AR 30. The ALJ found the VE's testimony highly credible and consistent with the Dictionary of Occupational Titles. *Id.*

At step five, the ALJ made an alternative finding that, considering Hey's age, education, work experience, and RFC, she was capable of making a successful adjustment to other work that exists in significant numbers in the national economy, including work as a tile worker or jewelry preparer—both of which are sedentary and unskilled positions. AR 31. Similarly, this conclusion was based on the testimony of the VE, which the ALJ again found consistent with the information contained in the Dictionary of Occupational Titles. AR 31.

Based on the ALJ's findings that Hey could perform past relevant work as a telemarketer, or alternatively, that she could perform other work available in the national economy, the ALJ determined that Hey was not disabled within the meaning of the Social Security Act and denied Hey's application for disability insurance benefits and supplemental security income. AR 32.

## III. STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "An individual shall be

determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence in the record as a whole. *See* 42 U.S.C. § 405(g); *see also Qualls v. Apfel*, 158 F.3d 425, 427 (8th Cir. 1998); *Gallus v. Callahan*, 117 F.3d 1061, 1063 (8th Cir. 1997); *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989). Substantial evidence means more than a mere scintilla; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 220 (1938)). In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight. *See Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999); *see also Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir.1989) (citing *Universal Camera Corp. v. NLRB.*, 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision. *See Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir. 2000); *see also Gaddis v. Chater*, 76 F.3d 893, 895 (8th Cir. 1996). "As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the case differently." *Roberts*, 222 F.3d at 468 (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). "Substantial evidence is less than a

preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id*. Therefore, this Court's review of the ALJ's factual determinations is deferential, and we neither re-weigh the evidence, nor review the factual record de novo. *See Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir. 1997); *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996). The Court must "defer heavily to the findings and conclusions of the SSA." *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001).

## IV.  CONCLUSIONS OF LAW

Hey raises four issues in her motion for summary judgment. First, Hey claims that the ALJ's RFC determination is not supported by substantial evidence. Pl.'s Mem. in Supp. of Mot. for Summ. J. 25, ECF No. 11. Second, Hey claims that the ALJ failed to fully and fairly develop the record. *Id*. at 29. Third, Hey claims that the ALJ failed to properly evaluate her credibility. *Id*. at 30. Finally, Hey claims that the ALJ failed to properly determine whether she met the "degenerative neurological impairment not listed elsewhere" impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1 § 11.17 [hereinafter "Listing 11.17"]. *Id*. at 33. After a thorough review of the entire record, the Court concludes that the ALJ's findings at each step of the sequential analysis were supported by substantial evidence in the record as a whole.

## A.    The ALJ's RFC determination is supported by substantial evidence

Hey contends that the ALJ improperly weighed the medical evidence in determining her RFC. ECF No. 11 at 25. Hey alleges three specific errors. First, she claims that the hypothetical posed to the VE failed to include all of the limitations shown by the record. *Id*. Second, she argues that the ALJ failed to take into account her complaints regarding migraines and double vision. *Id*. at 26–27. Finally, she contends that the ALJ erred in affording "little weight" to the medical opinion

of her primary care physician, Dr. Enberg. *Id*. at 27–29.

### 1. The ALJ's hypothetical to the VE included Hey's proven limitations

"A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001). "Testimony from a VE based on a properly phrased hypothetical question constitutes substantial evidence." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996). However, testimony of a VE who responds to a hypothetical based on inaccurate limitations is not substantial evidence upon which to base a denial of benefits. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).

Hey claims that the ALJ's hypothetical was deficient because it did not state that Hey required an assistive device for ambulation. ECF No. 11 at 25. According to Hey, this is contrary to the assessment of Dr. Sinaki, the Mayo Clinic physical medicine and rehabilitation specialist, as well as the medical opinion of her primary treating physician, Dr. Enberg. *Id*. at 25–26. This omission, according to Hey, constitutes reversible error. *Id*. The Court disagrees.

The purpose of the hypothetical question is to present the VE with a set of limitations that mirror those of the claimant. *Roe*, 92 F.3d at 676. Although the hypothetical question must set out the claimant's impairments, it may use descriptive terms as opposed to diagnostic or symptomatic terms. *Id*. For example, the ALJ's hypothetical did not state that Hey suffered from "autosomal-dominant familial cerebellar ataxia," but instead stated that "[d]ue to neurological condition, she presents . . . the capacity for light exertion . . . but with exceptions and limitations." AR 57. Regarding Hey's imbalance problems, the hypothetical stated "[a]ny kind of fine balancing tasks . . . could not be performed while she is walking. The individual will be awkward and . . . not swift

in doing work-like activities requiring her to walk." AR 58. These phrases sufficiently capture Hey's limitations. *See Roe*, 92 F.3d at 677.

Regardless, it is clear from the record that the VE understood that the ALJ's phrasing encompassed Hey's use of an assistive device. *See* AR 59. Indeed, the VE initially opined, based on the hypothetical, that Hey could not perform either light or sedentary work due to her use of a walker. AR 60. It was only after further clarification and modification of the hypothetical by the ALJ that the VE determined Hey would be able to perform her past relevant work as well as a telemarketer, or the additional occupations of inspection table worker and jewelry preparer polisher. *See* AR 60–62.

Accordingly, the Court concludes that the ALJ's hypothetical to the VE adequately presented Hey's limitations and the testimony of the VE therefore constituted substantial evidence.

### 2. The ALJ properly found that Hey's migraines and double vision were not severe medically determinable impairments

The claimant has the burden of proving the existence of an impairment by providing medically acceptable evidence to support her claim. *See Brown v. Shalala*, 15 F.3d 97, 99–100 (8th Cir. 1994); *see also Marolf v. Sullivan*, 981 F.2d 976, 978 (8th Cir. 1992). A medically determinable impairment is one that results from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3); *see also* 20 C.F.R. § 404.1527(a)(1). An impairment is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. §§ 1520(c) and 416.920(c). An impairment is "not severe" when medical evidence establishes only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. §§ 404.1521 and

416.921.

Hey contends that the ALJ should have found that her migraine headaches and vision problems were severe medically determinable impairments and considered them more fully in his RFC analysis. ECF No. 11 at 26–27. In support, she argues that her headaches render her unable to function once or twice per week for a half hour to two hours at a time. *Id.* at 26; AR 48. Additionally, she claims that her vision problems are brought on by the use of a computer, which would prevent her from performing past relevant work as a telemarketer. ECF No. 11 at 27; AR 63.

Hey's complaints notwithstanding, the ALJ declined to find that Hey's migraine headaches were a severe medically determinable impairment because (1) her March 2012 MRI did not demonstrate any abnormal signals or evidence of migraines, (2) she testified that she experienced the headaches only one to three times per week and her prescription medication is effective, and (3) the nausea and vomiting associated with the headaches is also improved with the medication. AR 26, 47, 473–74, 481–82, 530. Similarly, after reviewing the medical reports of Drs. Shuey, Johnson, and Krueger, the ALJ determined that Hey's vision problems cause no more than "minimal limitations." AR 26.

Upon reviewing the record, the Court concludes that the ALJ appropriately found that the medical evidence refutes the severity of the symptoms described by Hey. Hey simply has not shown clinical or laboratory diagnostic evidence that her migraines or vision-related problems would interfere with basic work activities such that a classification of "severe" is appropriate. In addition, the fact that Hey's migraines are responsive to treatment also supports a finding of nonsevere. *See Rose v. Apfel*, 181 F.3d 943, 944 (8th Cir. 1999). Hey's testimony to the contrary cannot, by itself, satisfy the medical evidence requirement of the statute. *See Marolf*, 981 F.2d at 978; *see also* 42

U.S.C. § 423(d)(5)(A) ("An individual's statement . . . shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment . . . .").

Therefore, the Court concludes that substantial evidence exists to support the ALJ's finding that Hey's vision problems and migraine headaches are not severe medically determinable impairments.

### 3.      The ALJ gave proper weight to the opinion of Dr. Enberg

"[A] treating physician's opinion is given controlling weight if it is well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005); *see also* 20 C.F.R. § 404.1527(c)(2). A treating physician's opinion, however, does not automatically control since the record must be evaluated as a whole. *Id.* An ALJ may discount or disregard "the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000). "Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." *Id.* at 1013.

Hey argues that the ALJ erred by not giving the proper weight to the medical opinion of her primary care physician, Dr. Enberg. ECF No. 11 at 27. In his January 2013 opinion, Dr. Enberg found that Hey could stand and walk less than two hours total in an eight-hour work day; lift very

little; and was unable to sustain work activity due to her inability to stand well, her poor strength and coordination, and "significant, persistent, and progressive disorganization of motor function in all extremities." AR 499. This physical assessment of Hey is at odds with the RFC determined by the ALJ. *See supra* Part II.C.3. Hey contends that the ALJ failed to give good reasons for granting Dr. Enberg's opinion little weight. *Id*. at 28. The Court disagrees.

As stated above, an ALJ is not required to give the opinions of treating doctors controlling weight if their opinions are not supported by the record. *See Prosch*, 201 F.3d at 1013. Indeed, as is the case here, an ALJ may grant a treating physician's opinion less weight when it is inconsistent with other medical evidence in the record. *See id.* at 1013–14 ("It is well established that an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record."). In granting little weight to Dr. Enberg's January 2013 opinion, the ALJ stated that it was not consistent with the weight of the evidence of record, particularly the examinations of Drs. McKee and Johnson. AR 29.

Dr. McKee, the neurologist who examined Hey on referral from Dr. Enberg in April 2012—two months after her amended alleged onset date—noted that Hey had normal strength and muscle tone in her arms and legs, no tremor or ataxia of the extremities, and no cognitive decline. AR 473–74. In contrast to the Mayo Clinic physicians, Dr. McKee did not believe that Hey suffered from cerebellar atrophy. AR 474. Dr. Johnson, the physician who conducted the April 2013 post-hearing consultative examination of Hey, noted that Hey could walk across the examination room without her two-wheeled walker, showed full range of motion of the joints and hands, and had only mild difficulty getting on an off the exam table. AR 531. Despite Hey's history of ataxia, Dr. Johnson determined that Hey had a capacity to perform a limited range of sedentary work. *See* AR

534–39. The ALJ's determination that Dr. Enberg's medical opinion was inconsistent with those of Drs. McKee and Johnson provided a sufficient basis to grant Dr. Enberg's opinion little weight. *See Goff*, 421 F.3d at 790–91 ("[A]n appropriate finding of inconsistency with other evidence alone is sufficient to discount [a treating physician's] opinion.").

Accordingly, the Court concludes that the ALJ did not err in granting the medical opinion of Dr. Enberg little weight because it was inconsistent with other substantial evidence in the record.

## B. The ALJ fully and fairly developed the record

An ALJ is required to fairly and fully develop the record, even where an attorney represented the claimant at the administrative hearing. *See Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) (citing *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983)). This duty to develop the record includes a responsibility to ensure that the record includes evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue. *Strongson v. Barnhart*, 361 F.3d 1066, 1071–72 (8th Cir 2004). The ALJ is required to order further medical examinations and tests if the medical records presented to him do not provide sufficient medical evidence to determine whether the claimant is disabled. 20 C.F.R. § 404.1517; *Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986). A plaintiff seeking to reverse an ALJ's decision due to the failure to adequately develop the record bears a heavy burden: a plaintiff must show both a failure to develop necessary evidence and unfairness or prejudice from that failure. *Haley v. Massanari*, 258 F.3d 742, 749-50 (8th Cir. 2001).

Hey claims that the ALJ failed in his duty to fully and fairly develop the record by giving Dr. Johnson, the post-hearing consultative examination physician, an incomplete and adversarial selection of the record. ECF No. 11 at 29–30. Specifically, Hey argues, Dr. Johnson was not given

the March 2011 report of Dr. Farache, a neurologist who determined that Hey's MRI from 2009 showed "mild cerebellar atrophy," or the December 2012 report from Dr. Krueger, the Mayo Clinic neurologist who concluded that Hey's MRI from 2012 "clearly shows midline cerebellar atrophy." *Id.* at 29; AR 360–61, 503. In short, Hey contends that Dr. Johnson was provided with the neurological report of Dr. McKee, but none of the other conflicting reports. ECF No. 11 at 30.

Despite Hey's arguments to the contrary, the Court concludes that the ALJ nonetheless fulfilled his duty to fully and fairly develop the record. The purpose of Dr. Johnson's post-hearing evaluation was to determine whether Hey was disabled, not to determine her ultimate medical diagnosis. *See* 20 C.F.R. §§ 404.1514, 404.1517, 416.914, and 416.917. The regulations state that "[t]he medical report must be complete enough to help us determine the nature, severity, and duration of the impairment, and residual functional capacity." 20 C.F.R. §§ 404.1519n(b), 416.919n(b). Dr. Johnson's report complied with this standard when he evaluated Hey's ability to perform work-related physical activities. AR 529–39.

In contrast, the medical reports identified by Hey are primarily concerned about diagnosis, not an assessment of physical functioning capacity. Moreover, it is clear from the record that Dr. Johnson was well aware of the fact that there were conflicting diagnoses between the Mayo Clinic physicians and Dr. McKee. AR 532. Dr. Johnson noted this discrepancy, and then proceeded to evaluate the extent of Hey's physical limitations related to her ability to work. AR 529–539. Any controversy regarding Hey's cerebellar atrophy diagnosis was immaterial to this physical assessment.

The ALJ attributed significant weight to the opinion of Dr. Johnson. AR 30. He found Dr. Johnson's report to be consistent with the examination evidence, Hey's activities of daily living, and

her improved functioning with physical therapy. *Id*. An ALJ does not fail in his duty to develop the record if substantial evidence exists to allow the ALJ to make an informed decision. *See Haley*, 258 F.3d at 749. Accordingly, the Court concludes that the ALJ fulfilled his duty to develop the record.

**C.      The ALJ's credibility determination of Plaintiff is supported by substantial evidence**

In analyzing the credibility of a claimant's testimony and subjective complaints, an ALJ considers objective facts such as the claimant's daily activities; the duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). Other relevant factors include the claimant's work history and the absence of objective medical evidence to support the complaints. *Id*. The ALJ may not discount a claimant's credibility solely because the objective evidence does not fully support his subjective complaints, but the ALJ may discount a claimant's credibility based on inconsistencies in the record as a whole. *Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005) (citing *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000)). Courts should defer to the ALJ's credibility findings when the ALJ gives good reasons that are supported by substantial evidence. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003)). The ALJ must "detail the reasons for discrediting the testimony and set forth the inconsistencies found." *Id*. at 802 (quoting *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)).

After weighing Hey's subjective complaints against other evidence, the ALJ determined that Hey's statements concerning the intensity, persistence, and limiting effects of her symptoms were not "entirely credible." AR 28. In making this determination, the ALJ cited to numerous instances where the medical examination evidence failed to support her reported limitations as well as to

discrepancies within Hey's reported activities of daily living. *See* AR 28–29. In response, Hey argues that the ALJ's credibility finding is not supported by substantial evidence in the record as a whole. *See* ECF No. 11 at 30–33. The Court disagrees.

The ALJ may discount subjective complaints if the evidence as a whole contains inconsistencies. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007). Here, the ALJ identified inconsistencies in the severity of Hey's reported limitations that were revealed in the various medical reports of Drs. Enberg, McKee, Krueger, Sinaki, and Johnson. *See* AR 28–29. Similarly, the ALJ identified discrepancies between Hey's allegations and her activities of daily living. AR 29. For example, the ALJ noted that Hey reported difficulties with double vision and an inability to walk more than 100 feet, yet she admitted that she was still able to make meals, vacuum, sweep, do some of the laundry, shop for groceries, drive short distances four to five times a week, and play video games. AR 29, 286–95. Likewise, the ALJ found her testimony at the hearing that she is unable to use a computer for longer than forty-five minutes was inconsistent with her reports of watching TV and playing video games. *Id*. Because of these inconsistencies, the ALJ concluded that Hey's testimony of "needing a walker to ambulate due to near-constant dizziness and falls is not supportable." AR 29.

After reviewing the record, this Court finds that substantial evidence existed in the record for the ALJ to conclude that Hey's claims were not entirely credible. As detailed above, the ALJ articulated the reasons for discrediting Hey's testimony and properly set forth the inconsistencies found. *See Finch v. Astrue*, 547 F.3d 933, 935–36 (8th Cir. 2008) ("[Q]uestions of credibility are for the [ALJ] in the first instance. If an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, we will normally defer to that judgment."). Therefore, Hey's claim that

the ALJ improperly evaluated her credibility is without merit.

**D. The ALJ's determination that Hey's impairment did not meet Listing 11.17 is supported by substantial evidence**

Plaintiff argues that the ALJ erred because the evidence of her impairment is such that she should be found disabled under Listing 11.17. *See* ECF No. 11 at 33–35. The listings set out in Appendix 1 describe various physical and mental illnesses and abnormalities, and each are defined in terms of specific medical signs, symptoms, and/or laboratory test results. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

At step three, the claimant bears the burden of proving that her impairments meet or equals a listing. *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004). "Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing. An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify." *McCoy v. Astrue*, 648 F.3d 605, 611–12 (8th Cir. 2011) (citing *Sullivan*, 493 U.S. at 530).

Listing 11.17 states:

11.17 Degenerative disease not listed elsewhere, such as Huntington's chorea, Friedreich's ataxia, and spino-cerebellar degeneration.
With:
      A.      Disorganization of motor function as described in 11.04B; or

      B.      Chronic brain syndrome. Evaluate under 12.02

20 C.F.R. Pt. 404, Subpt. P, App. 1. Listing 11.04B describes a central nervous system vascular accident with "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dextrous movements, or gait and station" for more than three months post-vascular accident. *Id.*

The ALJ determined that Hey's impairments did not meet the definitions outlined in Listing 11.17. Specifically, the ALJ stated, "The claimant does not meet or medically equal this listing because she has not demonstrated disorganization of motor function in two extremities resulting in sustained disturbance of gross and dextrous movements or gait and station, or chronic brain syndrome under Listing 12.02." AR 27.

Hey argues that, contrary to the ALJ's finding, she does meet the requirements of Listing 11.17. ECF No. 11 at 35. As evidence, Hey points to Dr. Sinaki's recommendation to use a gait aid and the physical therapist's conclusion that a two-wheeled walker was needed. *Id*. at 34; *see also* AR 502, 511, 515–16, 528. In addition, Hey cites the January 2013 opinion of Dr. Enberg in which he opined that there is "no way" Hey could work an eight-hour work day as she cannot stand well, falls constantly, and has poor strength and coordination. ECF No. 11 at 34; *see also* AR 499. Dr. Enberg added, "Angela has significant, persistent and *progressive* disorganization of motor function in *all* extremities. Gross motor, gait and station capabilities are most obviously affected." *Id*. (emphasis in original).

These arguments, however, are based upon medical opinions that were granted little weight by the ALJ. *See* AR 29–30. Indeed, the ALJ found that the January 2013 opinion of Dr. Enberg was not consistent with the weight of the evidence in the record, and Dr. Sinaki's December 2012 opinion did not indicate whether the use of a gait aid was a permanent restriction and was inconsistent with Hey's improved functioning with physical therapy and her activities of daily living. AR 29. More importantly, the ALJ's determination is supported by the medical opinion evidence of Drs. Johnson and McKee, whom the ALJ found presented credible evidence that Hey was not impaired to a degree that would meet Listing 11.17.

Accordingly, the Court finds that substantial evidence existed in the record to support the ALJ's determination that Hey did not have an impairment that met Listing 11.17.

## V. CONCLUSION

If the ALJ's decision is supported by substantial evidence on the record, this Court cannot reverse simply "because substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the case differently." *Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir. 2000). Here, substantial evidence supports the ALJ's RFC determination, development of the record, credibility determination, and evaluation of the case under Listing 11.17. Accordingly, the Commissioner's motion for summary judgment should be granted.

## VI. RECOMMENDATION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment (ECF No. 10) be **DENIED**;

2.    Defendant's Motion for Summary Judgment (ECF No. 12) be **GRANTED**;

3.    The Commissioner's decision be **AFFIRMED** and the case **DISMISSED WITH PREJUDICE**.


DATED: July 28, 2015                              *s/Franklin L. Noel*
                                                  FRANKLIN L. NOEL
                                                  United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **August 5, 2015**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.